The next matter on our calendar is Secretary of Labor v. Cranesville Aggregate Companies, Incorporated. Thank you. Good morning. Good morning. May it please the court. Ron Gottlieb for Secretary of Labor. Why does the Secretary of Labor care so much about which of his children agencies regulate this plant? Well, the Secretary cares about enforcing safety and health regulations. Right, but don't both of these agencies do that? Yes, but... Why does he care which one does it on this particular place? Well, one, because we issued citations and they were vacated based on an erroneous determination as to which one. In addition, if MSHA's status of authority is construed too broadly, MSHA has a lot of obligations to inspect those facilities, and that would divert MSHA's resources away from protecting minors doing mining activities. And OSHA protects minors too, doesn't it? I'm sorry? Doesn't OSHA protect minors, or at least people who work nearby mines, which is what this case is about? They protect... Yeah, OSHA protects... Right. They wouldn't protect minors engaged in mining activities. I understand. So why does the Secretary prefer MSHA to OSHA in this scheme of regulations? I think it's the other way around, isn't it? No, we prefer OSHA, because OSHA has more experience and more protective standards for protecting employees performing manufacturing-type activities that these employees were engaged in. Isn't it true further that, with respect to the facts of this case, that you prefer OSHA because all of the functions with respect to which violations were found were manufacturing functions as opposed to mining functions? Correct. That's correct. That's precisely... And the ALJ, who set it aside, part of his reasoning was that because there was a single room in the structure in which mining equipment was repaired, he read the language relating to a structure as meaning that everything that happens in that structure is deemed to be mining, even if the only thing that's mining in that structure is the repair of mining equipment in a single room that the other manufacturing employees were not even allowed to enter. That's correct, and we think that was legally erroneous. As to the drying of the sand, if I understand it correctly, all of the sand that was being dried in that facility was being dried for the purpose of mixing with cement and bagging it as a manufacturing process of cement, and that indeed a lot of the sand didn't even come from the mine but had to be purchased from outside sources to bring in sand needed to bag the cement. They got it from various places. They got it also from... Cranesville Block owns a lot of companies, interrelation. They got it from one of their other quarries in a different location. The drying of sand can be mining, especially where it's being dried to sell the product of the mine as mined sand, or it can be manufacturing if it's being dried as part of the manufacturing process. That's correct. That's the Secretary's position. The ALJ relied, concluding otherwise, what he believed to be the plain definition of dry. What kind of deference are we to pay to the Secretary's preference for OSHA to regulate this place rather than MSHA? We're entitled... Is there ever a deference and find that it's dispositive? No. We think it is under CFI and the cases applying CFI to statutory interpretations and under the Mine Act. The Secretary issued his interpretation that this was not a mine in the citation, and that CFI finds as an exercise of delegated lawmaking authority that the Commission and the courts are... So if the articulation by the Secretary is in a citation, a single piece of paper, it's not published as part of the regs, it's his application of his regs, the Secretary is a he, am I right? The Secretary is entitled... Is a man? He's entitled to binding deference. No, no, no. Give me that first. Is the Secretary a man? Am I referring to him by the right sex? Yes, I'm sorry. All right. So he says in his citation, this is a mine, ergo... Sorry, this is not a mine, ergo OSHA is the entity to do this. But that's the articulation of what is and is not. That's the articulation... Or whether it is or is not an OSHA enforcement versus an MSHA enforcement. Correct. But I do want to emphasize that we don't think... Our court in the... Chau, is that correct? In Lafoye. Yeah. Chau v. Russell v. Lafoye, they denied the CFI slash Chevron deference and applied Skidmore deference. Right. We could apply Skidmore deference to this. Right. And we could... It's our position that at a minimum we're entitled to Skidmore deference. And the AHA at least had to explain why our interpretation was not reasonable. Skidmore deference is applied to the extent that it's persuasive. And that's why I started your time at the podium by asking you why the secretary cares so deeply which of these sister agencies regulates the bagging plant. Well, because she wants her agencies to be exercising their authority both according to the law and efficiently. OSHA... You think it's more efficient to have MSHA regulate the quarry and OSHA regulate the bagging plant? It's more efficient for OSHA to regulate manufacturing activities and for MSHA to be limiting its limited resources to mining activities. Because you want the men and women who are doing the inspections down in the pit and not messing around. And one of the problems with the ALJ's decision is that we provided uncontroverted evidence that a functionally indistinguishable bag plant in the Midwest had been classified as a manufacturing facility subject to OSHA's control. The ALJ... In as close proximity to the Midwest as this one was to the pit here? The witness didn't give a lot of details but he said it was so similar he thought he was reading the same case file. And he said it wasn't adjacent and he talked about it being adjacent and that there was drying. And so the ALJ decision results in two bag plants being subject to different regulatory regimes. Your position is essentially that manufacturing functions should be treated as manufacturing functions and inspected by OSHA and mining functions should be treated as mining functions and inspected by the mining agency? Yes. That one. May I ask you just one? I guess I'll call it a procedural question or some housekeeping detail. Is the Occupational Safety and Health Review Commission from which this appeal is taken because they couldn't decide what the answer was, is that still only a two-person commission or has it now been fully constituted with an odd number of commissioners? Right now there's only one. In the second, one commission's term expired. I don't know if I've heard that he's intended to re-nominate the one whose term expired. I haven't heard anything about a third commission. All right. Thank you. That answers that question. You have reserved two minutes for rebuttal. We'll hear from Cranesville Aggregate Companies. Good afternoon, Your Honors. My name is Walter Braykell. I represent Cranesville Aggregate Companies in this appeal. So we know why Cranesville prefers MSHA because those citations, the OSHA citations were vacated. Do you expect you'd have a better chance? Well, they were vacated, Your Honor, because we challenged jurisdiction to vacate them. During the contest period. And we maintain that this is a 133 acre site upon which there are five buildings. All contiguous to one another. All with a road going from a lower pit up to where these structures are. It's our position that the scope of review here is whether the LHA was arbitrary, capricious, abused its discretion or was unlawful. I don't think any of the first three apply. I don't think they're being argued. I think the issue is whether the ALJ was wrongfully interpreted the law when he came to his conclusions. The decision was well supported and it's consistent with the legislative intention of the Mine Act. That being that the Mine Act, excuse me, be construed very broadly to the extent that where there's any leeway, there should be a leeway that the facility be included as a mine. The ALJ was very much influenced by language to the effect that drying can be milling and that milling is mining. But the ALJ didn't give any attention whatsoever to the words, I think it's from the MOU, to the effect that milling can be expanded to apply to the mineral manufacturing process where there's reason to do so or can be narrowed when there's reason to consider it part of the manufacturing process.  In this case, it seems to me quite clear that the sand that was being dried in the bag plant was being dried not for the purpose of selling it as produce of the product of the mine, but was being dried in this separate building, which is the bagging plant for the cement. It was dried for the purpose of mixing the cement and bagging it and selling it as cement, which is a manufacturing process. I disagree with that, Your Honor. I don't think that was the ultimate facts here. Yes, the secretary underneath the MOU had the right to restrict... If I understand correctly, furthermore, of the roughly 30 citations that were issued here, only a tiny percent even had to do with the sand drying. Maybe three or so had to do with the sand drying process where it was being dried for purposes of mixing with cement and bagging, and the others all had to do with the mixing and bagging process, which was indisputably manufacturing. Well, there was different citations issued, Your Honor. Some of them dealt with electrical issues. Some of them dealt with... which would also include the drying process. But generally speaking, that is correct. The key here is, Your Honor, is what does the statute say? The statute says that there's a structure in which equipment is maintained, stored, or otherwise used in the mining process. The MOU says, to guide people on the jurisdictional question, is if there is milling in the processes, that is, in fact, mining. It doesn't, as ALJ said, it doesn't say how much milling goes on. It says that if milling goes on... Now, the drying aspect, I disagree with you. I think that was a separate processing of the sand by separating the water from the sand. So then... But it was doing it for the purpose of preparing that sand. It was doing it not to sell the sand as mined sand. It was doing it for the purpose in that building of combining the sand with cement and bagging it. So that's why the document says that milling can be expanded or reduced depending on what the purpose of the drying of the milling or the drying of the sand is. We had two experts, Your Honor, that both came in and testified, one for the secretary and one for the employer. And both of them acknowledged that the sand, for the purpose of consuming, all right, needed to be dried, all right, for a cementious period. Our expert, who was a former assistant secretary of labor, had testified that his observation of the processes was, in fact, milling. Now, set that aside, okay, when you interpret... We don't get to the secretary's deference at all here. The statute is very clear, all right, as to what should be included as a mine. A mine is not the layperson's definition of what we would think, as a consumer, a mine. It's very, very, very broad. In this case, which the secretary had not brought up, is that MSHA also has citations, innocuous for the same kind of violations that OSHA has. And there is, in the statute... MSHA has fined you for the very same violations? No, they have regulations which would be comparable to these violations. So if another federal agency has regulations that cover the same type of activity, then OSHA is precluded from stepping in and asserting its jurisdiction on a limited part. And how come, since MSHA has mandatory visits twice a year, and OSHA does not have any mandate to visit, that these citations came from OSHA? I don't know what the standards of OSHA are. My experience with OSHA is, generally speaking, they're a hit-and-miss inspection unless they have a complaint. In this instance... Could we take these MSHA violations and have them turn them over to OSHA, and OSHA just go write the violations for you, and then we're all out of here, and you got OSHA doing what you needed, you wanted to... No, sorry, MSHA doing what you wanted to do, and we can all go home. Well, the same conditions don't exist anymore, Your Honor, but back... But they were still violations at the time that they were issued. Now, whether you're subject to monetary penalties... That would be correct. All right, so could we just flip it and say, yeah, okay, give it to MSHA, and MSHA can write the bill. Other than the jurisdictional issue and a lack of notice to the employer as to which... Well, you got plenty of notice. You're asking for MSHA to be there, and we're just going to turn this over to OSHA, OSHA to MSHA. I think there's separate agencies that have separate purposes and separate expertises. In this particular... So whose expertise should be used in looking at what was there? In our particular position... In this manufacturing process. Well, it's not a manufacturing process. We keep on hearing people say it's manufacturing, Your Honor. In this mining process that's using machines. Fine. In our opinion, MSHA should be there. All right, so did OSHA accurately characterize what the problems were? No, because when OSHA issued the citations, the facility had MSHA wire wired throughout the structure, and they had to take out... MSHA-compliant wire, is that what we're talking about? Pardon me? MSHA-compliant wire? Yes, it's marked MSHA right on the casing, and it had to be taken out of the building to comply with OSHA, and it was ripped right out of the building, all right? So in answer to your question, it was MSHA-compliant, but theoretically not OSHA-compliant. Now, that's not an enforceability question. It's a question of what is the standard of safety for an electrical wire? And that's when the employer is not subject to objective evaluation of what the standards are. And it's both agencies... Both agencies care about the health, welfare and safety of employees, all right? There's not a question here. And the question is, I don't have an answer whether all the citations that the Secretary wrote would have been the same citations MSHA wrote, or MSHA may have written more, but in different areas. I don't have that answer. But when we know what agency that rules over the structure, the equipment and the mine, which is, again, 133 acres, the only thing that's not considered part of the mining process is one of three rooms in a warehouse structure. The rest of the structure has equipment, storage equipment, maintenance equipment. The Secretary argues that that's the manufacturing plant. No, it's not, Your Honor. There's a room in there that he alleges manufacturing takes place. The other two rooms in the same building deal with storage material, maintenance material, the maintenance and mechanics that service the equipment down below, as well as the bagging plant equipment. We're in that room. No, OSHA has expertise about manufacturing. It's not manufacturing, Your Honor. It's our position, what was going on— The bagging of what's for sale, manufacturing, at the very least. It's closer to manufacturing than it is to mining. But the statute says, read broadly, if there's mining activities in the structure itself, the Secretary would like you to read the statute that says, to the extent that mining occurs. Well, that's not what the statute says. The statute says if there is mining in the structure, in this broad aspect of mining, it is, in fact, a mine, and MSHA has jurisdiction. What was adopted by the ALJ was that because there's a room in the structure in which mining equipment is repaired, everything in the building is deemed to be mining, even when it's not mining. Does that make any sense? I don't think—well, that was the intent of Congress when they enacted the statute, that where you have competing uses, and you want efficient use of resources. We have a 133-acre plant, five buildings, one of which has one room out of three that may have manufacturing processes. MSHA has a better—they're going to be visiting the place every place a year. OSHA comes— Why do you say may have? I mean, isn't it clear that the mixing of sand with cement to produce a saleable cement is manufacturing rather than mining? That process of actually placing them together arguably is manufacturing, but the process of drying it so that it could go to the next step of being bagged with cement, you have to separate that moisture, Your Honor. Otherwise, you're going to have a big, hard block. That moisture is extraordinarily important. Now, can you sell sand without separating the moisture? Sure. It depends on what the purpose of it is. In this case, the drying process— Is it correct that the sand that was being dried in this building was not being sold simply as sand? The drying part? The sand that was being dried in this building— Right. —was not being sold simply as sand. It was being dried for the purpose of mixing it with the cement. The drying is a process. I'm asking you a question about whether the sand that was being dried in this building was being dried for the purpose of simply selling it as sand or for purposes of using it to mix it with cement. It was not being sold— The drying process was not for the purpose of drying the sand for being sold solely as sand. It was a process by which you prepare the sand to go to the next step. And at that step, arguably, it's manufacturing. But the drying process, separating the moisture from the mineral itself, is, in fact, drying, and it is, in fact, mining, Your Honor. May I ask one question? Because I'm interested in the wiring that you told us. Yes. In the record, does the record sort of back up or tell us about what you just told us? As I sit here today— I was a trial counsel, and I lived through this as well as the other counsel here in the room. As I sit here today, I remember photographs being introduced to the ALJ, I believe, as part of the record, only to demonstrate that as part of the record that the employer considered it an MSHA facility. That was so— Did the agency writ large, did the secretary and his minions tell you whether MSHA, in advance, or as you were getting advice on doing it, whether you needed MSHA-compliant wiring or OSHA-compliant wiring? They took it out, Your Honor, when they got all the citations. They were told by OSHA, this is our jurisdiction. They didn't want to get another citation down the road. The facility was still operating, so they took it out and, I believe, installed OSHA-compliant, based upon OSHA wiring. In this particular instance, Your Honor, the—I'm probably getting a little dry. There was no notice that OSHA was coming or MSHA was coming. When a complaint first came in, the record will reflect, OSHA went to our ready-mix concrete facility down the road, thinking that's where the complaint was. They were directed to go down to where the mine was, because that was where the complaint came from. The inspector called his home office and says, no, that's MSHA's jurisdiction. Come on back. He went back. Subsequently, and the record's unclear and I don't know what happened, they said, no, that's ours. They went to there and did their inspection and issued the citations that came along. Now, our position would be—is, when the citations were issued and we contested them, we raised a jurisdiction issue right away. And that's preserved the question. And we're looking at the plain reading of the statute. It's our contention and the intent of Congress and MOU, which the intent is to be applied in jurisdictional questions. There's no ambiguity here. The secretary's deference doesn't come in. It's easily applied based upon the existing statute. Thank you, Your Honor.  Mr. Gottlieb, you have two minutes for rebuttal. Okay. As we explained, the statute does not unambiguously say that using one part of a building means the entire structure is used for mining activities. What about drying of the sand that Judge LaValle was asking about? Is that part of the manufacturing? Absolutely, Your Honor. It was used—they dried it to mix it with cement. There was actually some evidence that they dried it to make because it was easier to handle. And they might have bagged some sand just by itself. But it was—they treated the sand that they received from the plant the same that they treated sand from any other facility. So it's not part of the mining or milling that occurred from the sand. Your adversary acknowledged that none of the sand, if I understood correctly, he acknowledged that none of the sand that was being dried in this building was being used to be sown as sand. All of it was being dried to be bagged, mixed and bagged as sand. If that's his understanding, I'll accept it. Am I not correct? Did you acknowledge that? That is correct. Okay. But in addition to the reason we gave in our brief, saying that one part of a structure is used for mining means— it doesn't mean that the entire structure is. The statute expressly recognizes that the same physical establishment can be used for—can be subject to both OSHA and MSHA's— That sounds like a nightmare. Authority. Well— The problem I have with that is this wiring thing that we heard about. You could have MSHA-compliant wiring, but OSHA's going to say, no, that's— you have to have OSHA-compliant wiring. There was no evidence about— there was evidence that they used MSHA wiring, but there was no evidence there was a conflict or that was done pursuant to something that MSHA said or that they were doing it to comply with MSHA. In fact, they specifically told the MSHA instructors that the building plant was not part of the mine. And then on prior occasion, they responded to OSHA in OSHA letters saying that they'd received a complaint by saying,  and we're going to continue to comply with OSHA. Do you—excuse me. Do you agree that the MOU is a jurisdiction-deciding document? Is that what it's about? Well, it helps the agencies decide which agencies— And where would it lead in this case? We believe it leads to OSHA having authority because it explains that drawing, which the ALJ said was milling, can be either. And that you have to look at— its relationship to other milling processes and to the other processes that are going on at the facility. So it can be incidental to manufacturing or it could be incidental or be part of the milling. And we say it was part of the manufacturing. I understand. Thank you. Thank you both for an interesting argument. The last case on our calendar is on submission. So I'll ask the clerk to adjourn court. Court is adjourned.